[Cite as *Mason v. Dir., Ohio Dept. of Job & Family Servs.*, 2022-Ohio-1067.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

MICHELLE MASON,                                :

    Plaintiff-Appellant,                      :

                                      No. 110672

    v.                                                    :

DIRECTOR, OHIO DEPARTMENT           :
OF JOB AND FAMILY SERVICES,
ET AL.,                                                  :

    Defendants-Appellees.                   :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** March 31, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-20-937442

---

## *Appearances:*

Civil Litigation Clinic, Cleveland Marshall-College of Law, Cleveland State University, Kenneth J. Kowalski, *for appellant*.

Dave Yost, Ohio Attorney General, and Laurence R. Snyder, Senior Assistant Attorney General, *for appellee* The Ohio Department of Job and Family Services.

Jackson Lewis P.C. and Vincent J. Tersigni, *for appellee* Plain Dealer Publishing Co., Inc.

LISA B. FORBES, J.:

{¶ 1}   Michelle Mason ("Mason") appeals from the common pleas court's judgment affirming the Unemployment Compensation Review Commission's ("UCRC") determination that she was ineligible for unemployment compensation benefits.  After reviewing the facts of the case and pertinent law, we reverse the lower court's judgment.

## I.   Facts and Procedural History

{¶ 2}   Mason began working part time at the Plain Dealer Publishing Company (the "Plain Dealer") on July 17, 2018.  Ultimately, Mason was promoted to a full-time district manager.  The Plain Dealer terminated her employment on November 11, 2019, "for leaving the depot delivery area without authorization in a company vehicle."  Mason filed for unemployment benefits, claiming that she was terminated without just cause because she was unaware of this "policy" and that the violation may result in termination of employment.

{¶ 3}   In December 2019, the Ohio Department of Job and Family Services ("ODJFS") allowed Mason's unemployment compensation claim finding that she was discharged without just cause.  Specifically, ODJFS determined that Mason "was terminated for violating a company policy however the employer has not provided the agency with any details/supporting documentation regarding the final incident.  Just cause not established."  In April 2020, the Plain Dealer appealed to the UCRC.

{¶ 4} On July 21, 2020, the UCRC held a telephone hearing on the merits of the Plain Dealer's appeal. The UCRC issued a decision reversing ODJFS's determination and disallowing Mason's claim. Mason appealed the UCRC's decision to the common pleas court, and on June 17, 2021, the court affirmed the UCRC's decision.

{¶ 5} It is from this order that Mason appeals raising the following assignment of error: "The trial court erred in affirming the hearing officer's decision because the hearing officer's factual findings are not supported by the record, rendering her decision unreasonable, unlawful, and against the manifest weight of the evidence."

## II. UCRC Hearing Testimony

### A. Catherine McBride

{¶ 6} Catherine McBride ("McBride") testified that she is a circulation operations director at the Plain Dealer, and Mason was employed as a district manager. According to McBride, Mason's "basic job duties are to make * * * sure that papers get delivered every single day." McBride testified that this is an "overnight" job with hours starting from 9:00 p.m. and running through 11:00 a.m. Mason was assigned to the "Westlake depot," and she was "discharged for leaving the territory during working hours without permission." The territories are "defined by zip codes," and Mason's home was not in the territory that Mason was assigned to work. According to McBride, violation of this policy is an "egregious offense" and "you [are] terminated."

{¶ 7} McBride testified that "normally" employees "get permission to go, when to take their break * * *. But they can go anywhere and do anything they like within that territory." If an employee wants to go outside their territory, they should "ask the manager. Or at least make the manager aware that you're leaving the area." According to McBride, this policy is to keep employees in the territory if needed as well as being "a safety issue."

{¶ 8} McBride testified that this is "not a written policy. It's just one of those understood policies that has been around since forever." According to McBride, this policy is "reviewed with [employees] at the time of hire."

{¶ 9} McBride testified that because there were "grumblings" about Mason "going home and leaving the territory and being gone for extended periods of time and not being around to help with stuff," McBride asked that someone "review the policy with everybody in the depot, make sure they all understand it so that if it is happening it comes to a stop."

{¶ 10} According to McBride, Terry Franklin ("Franklin"), who was Mason's depot manager, "met with everyone * * * to reiterate the policy just to make sure everyone's on the same page. But this is long-standing policy at the Plain Dealer. It's not a gray area." Asked if, to her knowledge, Franklin reviewed the policy with Mason, McBride answered, "He did." According to McBride, she knew this because Franklin sent an email confirming that he "talked to everybody."

{¶ 11} This email, which was admitted as evidence at the UCRC hearing, was sent from Franklin to another Plain Dealer employee at 4:52 a.m. on October 17,

2019, who then forwarded Franklin's email to McBride on October 31, 2019. Franklin's email states as follows:

> I spoke with Michelle Mason this morning and reiterated company policy regarding bargaining unit employees leaving the depot delivery area without authorization in a company vehicle. I stressed that lunch breaks were included in the policy. I told her if she had any questions or concerns, now was the time to ask. She replied that she understands the policy and did not have any questions. I followed up by saying disciplinary [sic] could include termination of employment.

{¶ 12} McBride testified that Mason's conduct came to the Plain Dealer's attention again as follows: "Someone had * * * anonymously sent a video and a picture of her car at her home, in her home driveway to us." To verify that this was not "a one-time thing," McBride sent Franklin to Mason's home on November 2, 2019, and November 9, 2019, "and he observed her car both times, our Plain Dealer vehicle, both times in her driveway during working hours."

{¶ 13} Franklin did not testify at the UCRC hearing.

{¶ 14} McBride testified that Mason was a member of Teamsters Local 473 union. According to McBride, John Gill ("the Union Rep"), who is the Teamsters Local 473 union representative, was part of the phone call when McBride terminated Mason's employment. Paul Cavanaugh ("Cavanaugh"), who is the director of labor and employee relations for the Plain Dealer, was also on the line.

{¶ 15} McBride testified that she told Mason that Mason "broke this policy. This is not, there's no gray area here with this one. You know, it's too well documented and too many people know about it. You, this is, you just went too far." According to McBride, Mason "genuinely seemed shocked that I was letting her go."

Mason did not ask any questions about the reason for the discharge, including what dates the violations allegedly occurred, and she did not explain why she left the territory without permission.

## B. Paul Cavanaugh

{¶ 16} Cavanaugh testified that he was "brought into" the Plain Dealer's "investigation" of Mason on October 31, 2019, as a result of the "email with a photo and a video of what turned out to be the car that * * * Mason had for the day in her driveway on October 25th."

{¶ 17} Cavanaugh testified that Kevin Hanna, a field operations manager with the Plain Dealer, drove by Mason's house on November 2, 2019, and November 7, 2019, and "both times he went there * * * the car was there." Cavanaugh testified that he was not on the phone call when Mason was terminated.[1] Cavanaugh further testified that he was the Plain Dealer representative at Mason's union grievance meeting, during which Mason admitted going home on the days in question.

{¶ 18} Cavanaugh testified that "eight days before the first video and picture were taken of * * * the car in her driveway, * * * Franklin had sat down with all, individually with each of the * * * district managers and reiterated the policy that you can't leave without permission, including lunch breaks." Cavanaugh further testified that, at the union grievance meeting, Mason admitted that Franklin spoke

---

[1] We note that there are inconsistencies between McBride's testimony and Cavanaugh's testimony regarding minor issues such as who drove by Mason's house, the dates this person drove by Mason's house, and whether Cavanaugh was part of the phone call during which Mason was terminated. However, we are not tasked with determining the credibility of witnesses in an unemployment compensation benefit appeal.

with "her and the others * * * but denied that he ever said anything about * * * being discharged for leaving."

{¶ 19} According to Cavanaugh, "this is a long-standing, well-communicated policy that, in circulation, * * * employees are not allowed to leave their delivery area during their work shift without permission and it includes lunch breaks."  Mason's was the ninth violation of this policy since 1995 "and all have been discharged." Cavanaugh further testified that "we routinely, in other cases, have brought those employees back on Last Change Agreements that simply state they violated it, * * * it's a long-standing policy and * * * if they ever do it again they'll be discharged and that will be the end of it."  Cavanaugh further testified that the Plain Dealer did not bring Mason back because "Mason was extremely evasive, * * * had shown no remorse, * * * didn't say she was sorry, didn't say it would never happen again."

**C. Michelle Mason**

{¶ 20} Mason testified that the Plain Dealer told her she was fired for "leaving the territory during your shift without permission."  Asked when she first learned of this policy, Mason answered,

> I never learned of the policy, ever.  Basically, * * * until they said, * * * on the termination call I had no clue what they were talking about because we do get a 45-minute unpaid break and that can be taken anywhere in that shift time.  And I did check with the union rep * * * and asked him early on if it was okay if we went home on lunch and he said, "Yes.  The company cannot tell you where you can and can't go on breaks."

{¶ 21} Asked if Franklin discussed the policy with her, Mason answered, "He did not.  * * * He literally just said, 'Something happened.  I don't know what

happened.  Just lay low and be answering your phone.'  I always answer my phone, so it's no big deal.  Literally, end of discussion.  * * * So I was never aware of any policy.  I have no idea what they're talking about."

{¶ 22} Asked if Franklin talked about any specific policies, Mason testified as follows:

> No.  There is no policy.  That's the thing.  That's why I submitted everything that I was given by HR initially.  There's no policy.  They said it's a long-standing rule.  And these people have been there 20, 30 years.  And maybe for them, but * * * it's not communicated to any of the new hires, we didn't know about it.  We didn't know anything.  * * * But, again, if you don't communicate that, how am I supposed to know?  I'm not a mind reader.  It was never communicated.

{¶ 23} Mason testified that she admitted at the union grievance meeting to going home on more than one occasion because she did not know about the Plain Dealer policy against this.  According to Mason, she asked the Union Rep, "Is it okay if I go home?" and the Union Rep said, "Yes.  The company can't tell you where to go."  Mason did not dispute that she went home twice in November during her shift.

{¶ 24} Asked if her house, which is in Parma, was within her Plain Dealer territory, Mason answered, "Yes" and gave the following explanation:

> Well, it's between the two depots.  We were getting routes from Van Epps which is the original place I started, and routes were being moved to Westlake because the Plain Dealer is newspaper industry and they're losing hundreds of customers per year.  So I know they went from having, I believe 30-some depots * * * down to four.  * * I know that I did routes from Van Epps over at Westlake.  * * * So if you actually Mapquest the two depots, you'll see that they're only approximately 15, 16 minutes apart.  So my house is in between them.  So, to really say that I'm out of delivery area * * * I mean, it's really splitting hairs * * *.

**D. The Recording**

{¶ 25} Mason testified that she recorded her union grievance meeting and conversations she had with the Union Rep prior to the meeting. These recordings were admitted as evidence at the UCRC hearing. In the recording, Cavanaugh read Mason the email from Franklin where Franklin stated that he met with Mason and reiterated the company policy to her. Mason's response was, "He did not say anything about termination." At the UCRC hearing, Mason was asked why she did not deny anything in the recording. Mason testified as follows: "He did not explain a policy, he did not explain a rule and he did not say anything about termination."

{¶ 26} In the recording, the Union Rep stated the following prior to the grievance meeting: "[T]he fact that they didn't give you an ultimatum about, Michelle, we catch you off your district again, you can be fired. The fact that they didn't do that, or nobody said anything to me, we got something to argue." The Union Rep further stated at Mason's grievance meeting that he did not "think she was fully aware" of the policy and the ramifications of violating.

{¶ 27} Mason stated the following in the recording prior to the grievance meeting:

> I always did my job, whatever was asked of me, trained new employees, made people feel welcome. Fast forward to now, and Franklin said, "I don't know, something must have happened but when you guys go on break, stay within your delivery area and keep a low profile." And he was real vague, general. And I walked away thinking someone must have taken their company car and drove it to the east side or something serious. I had no idea he was talking about me.

### III. UCRC's July 27, 2020 Decision

{¶ 28} Under a section entitled REASONING, the UCRC decision stated the following in part pertinent to this appeal:

[Mason] was discharged from her employment with the Plain Dealer * * * on November 11, 2019, for leaving the depot delivery area without authorization in a company vehicle. [Mason] has presented numerous arguments in support of her position that she was discharged without just cause in connection with work. [Mason] first argued that she was not aware of the policy. Although it was not a written policy, [Mason] admitted at the hearing that less than three weeks before her final two violations, * * * Franklin reminded her about the policy and told her to make sure she stayed in the delivery area when she went on break. [Mason] argued that she was not told that this was a dischargeable offense. However, she was not told that a lesser discipline would apply, and she did not ask for clarification of the penalty for violations. [Mason] argued that while she was technically away from the district, she was only a few streets away. However, the rule is based upon delivery area, not distance. [Mason] argued that she was often called upon to deliver things from the delivery area that covered her house, so she should not technically have been considered to be away from her delivery area. However, she concedes that she was out of the delivery area for her assigned depot. [Mason] argued that she was on her unpaid lunch break when she went to her home. However, she admits that * * * Franklin told her to stay in the delivery area when she went on break. [Mason] argued that * * * Franklin spoke to all the employees about the rule on the same day, so she did not consider their discussion to be a disciplinary meeting. However, it is clear that the point of the meeting was not to discipline [Mason] but rather to be sure she was informed of the policy in case she violated it again.

### IV. Common Pleas Court June 17, 2021 Decision

{¶ 29} The common pleas court issued the following journal entry: "The court affirms the final decision of the [UCRC] that * * * Mason was discharged for just cause in connection with work. The [UCRC's] decision was supported by the evidence in the certified record and, therefore, it was not unreasonable, unlawful or against the manifest weight of the evidence."

### V. Law and Analysis

#### A. Standard of Review

{¶ 30} The standard of review for common pleas and appellate courts regarding unemployment compensation benefits is as follows: "If the court finds that the decision of the [UCRC] was unlawful, unreasonable, or against the manifest weight of the evidence, it shall reverse, vacate, or modify the decision, or remand the matter to the [UCRC]. Otherwise, the court shall affirm the decision of the [UCRC]." R.C. 4141.282(H). *See also Cuyahoga Metro. Hous. Auth. v. ODJFS*, 8th Dist. Cuyahoga No. 103399, 2016-Ohio-3457, ¶ 14 ("Appellate courts are * * * to apply the same standard of review as the trial court and may reverse the [UCRC's] 'just cause' determination only if it is unlawful, unreasonable or against the manifest weight of the evidence.").

{¶ 31} The Ohio Supreme Court has held that "while appellate courts are not permitted to make factual findings or to determine the credibility of witnesses, they do have the duty to determine whether the [UCRC's] decision is supported by evidence in the record." *Tzangas, Plakas & Mannos v. UCRC*, 73 Ohio St.3d 694, 696, 653 N.E.2d 1207 (1995).

#### B. Unemployment Compensation Benefits

{¶ 32} Pursuant to R.C. 4141.29(D)(2)(a), "no individual may * * * be paid [unemployment] benefits * * * if [ODJFS] finds that * * * [t]he individual * * * has been discharged for just cause in connection with the individual's work." Although there is "not a slide-rule definition of just cause," Ohio courts have held that the term

means "that which, to an ordinarily intelligent person, is a justifiable reason for doing or not doing a particular act." *Peyton v. Sun T.C. & Appliances*, 44 Ohio App.2d 10, 12, 335 N.E.2d 751 (10th Dist.1975). "The determination [of] whether there is just cause for discharge depends upon the factual circumstances of each case." *Williams v. Ohio Dept. of Job & Family Servs.*, 129 Ohio St.3d 332, 2011-Ohio-2897, 951 N.E.2d 1031, ¶ 22.

> A just-cause determination must be consistent with the legislative purpose underlying the Unemployment Compensation Act: to provide financial assistance to individuals who are involuntarily unemployed through no fault or agreement of their own. *Tzangas* [at 697]. "When an employee is at fault, he [or she] is no longer the victim of fortune's whims, but is instead directly responsible for his [or her] own predicament. Fault on the employee's part separates him [or her] from the Act's intent and the Act's protection." *Id.* at 697-698. Hence, just cause, under the Unemployment Compensation Act, is predicated upon employee fault. *Id.* at 698.

*N. Olmsted v. Fox*, 8th Dist. Cuyahoga No. 107519, 2019-Ohio-1776, ¶ 12.

**C. Analysis**

{¶ 33} The salient issue in the case at hand is whether Mason knew or should have known about the Plain Dealer's policy that employees are not allowed to leave their assigned areas during their shifts. The evidence in the record shows that Mason adamantly and consistently denied knowing about this policy at the UCRC hearing. Testimony given at this hearing established that the policy is unwritten and just "understood" by Plain Dealer employees.

{¶ 34} The UCRC's decision stated in part that Mason "admitted at the hearing that less than three weeks before her final two violations, * * * Franklin reminded her about the policy and told her to make sure she stayed in the delivery

area when she went on break." This is not supported by any evidence in presented at the UCRC hearing. The decision further stated that Mason "admits that * * * Franklin told her to stay in the delivery area when she went on break." Again, this is not supported by any evidence presented at the UCRC hearing. Simply put, there is no evidence that Mason "admitted" that she was aware of the policy at issue.

{¶ 35} In *Apex Paper Box Co. v. Admr., Ohio Bur. of Emp. Servs.*, 8th Dist. Cuyahoga No. 77423, 2000 Ohio App. LEXIS 2038 (May 11, 2000), this court held that a "mere violation of a company work rule does not always rise to the level of fault required on the part of the employee to justify a denial of unemployment benefits." In *Apex*, the employee ("Brickey") was terminated for failing to "punch out" when going to lunch. Brickey "testified she did not know it was an established work rule to punch out before leaving for lunch." Despite this being a written company rule, evidence in the record showed that Apex "did not know whether employees were given a copy of the work rules * * * when [Brickey] was hired." Brickey "testified that she was never given a copy of the work rules." *Id.*

{¶ 36} The *Apex* Court opined that "[w]hen the reason for discharge is a policy violation, the reason can only constitute just cause if the policy was fair * * *. To be 'fair' a policy must be communicated to the employee." *Id.* The court continued:

> The record contained competent credible evidence that the time clock policy was not fair. Brickey testified that she was never given a copy of the work rules. Bricky's statement on her application that the policy had never been enforced was not an admission that she was aware of the policy before she violated it. Brickey denied she told the personnel

manager that she forgot to punch out.  There was no evidence Brickey attended the two meetings where the employees were told to punch out if they leave for lunch.

*Id.  See also Piazza v. Admr., Ohio Bur. of Emp. Servs.,* 72 Ohio App.3d 353, 357, 594 N.E.2d 695 (8th Dist.1991) (in determining whether an employee has been discharged for just cause "[t]he critical issue is not whether the employee has technically violated some company rule, but whether the employee by his actions demonstrated an unreasonable disregard for his employer's best interest").

{¶ 37} Upon review, we find that this case is similar to *Apex.*  The weight of the evidence at the UCRC hearing showed that Mason did not know about the policy for which she was fired.  The UCRC's findings that Mason admitted knowing about the policy, and thus that Mason "was discharged from her employment with [the] Plain Dealer * * * for just cause in connection with work" are against the manifest weight of the evidence.

{¶ 38} Mason's sole assignment of error is sustained.  The trial court's judgment is reversed, and this case is remanded to the trial court to enter judgment in favor of Mason.

It is ordered that appellant recover from appellees costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

EILEEN A. GALLAGHER, J., CONCURS;
FRANK DANIEL CELEBREZZE, III, P.J., DISSENTS (WITH SEPARATE OPINION)

FRANK DANIEL CELEBREZZE, III, P.J., DISSENTING:

{¶ 39} I respectfully dissent from the majority opinion. In my view, the UCRC's decision is supported by competent and credible evidence in the record. Accordingly, I would affirm the trial court's judgment.

{¶ 40} As the majority clearly recognizes, this court is precluded from making factual determinations or determining the credibility of the witnesses in unemployment compensation cases. It is the function of the commission, as the trier of fact, to make factual findings and determine the credibility of witnesses. The case law is clear, this court must defer to the commission on factual issues regarding the credibility of witnesses and weighing conflicting evidence. *Irvine v. Unemp. Comp. Bd. of Rev.*, 19 Ohio St.3d at 18, 482 N.E.2d 587 (1985); *Tzangas*, 73 Ohio St.3d at 696, 653 N.E.2d 1207.

{¶ 41} This court cannot substitute its own factual findings for the findings of fact made by the commission if there is competent, credible evidence in the record supporting the commission's decision. *Lorain Cty. Aud. v. Unemp. Comp. Rev. Comm.*, 9th Dist. Lorain No. 03CA008412, 2004-Ohio-5175, ¶ 8. Furthermore,

*"[e]very reasonable presumption should be made in favor of the commission's decision and findings of fact."* (Emphasis added.) *Banks v. Natural Essentials, Inc.*, 8th Dist. Cuyahoga No. 95780, 2011-Ohio-3063, ¶ 23, citing *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19, 526 N.E.2d 1350 (1988).

> The fact that reasonable minds might reach different conclusions is not a basis for the reversal of the board's decision. *Craig v. Bur. of Unemp. Comp.* (1948), 83 Ohio App. 247, 260 [38 O.O. 356]. Moreover, "[o]ur statutes on appeals from such decisions [of the board] are so designed and worded as to leave undisturbed the board's decisions on close questions. Where the board might reasonably decide either way, the courts have no authority to upset the board's decision." *Charles Livingston & Sons, Inc. v.. Constance* (1961), 115 Ohio App. 437, 438 [21 O.O.2d 65].

*Irvine* at 18.

{¶ 42} In the instant matter, it is undisputed that the Plain Dealer's policy prohibiting employees from leaving their assigned areas during a shift without permission is not a written policy. However, in my view, the record contains competent, credible evidence that Mason knew, or should have known, about the policy and failed to abide by it.

{¶ 43} Catherine McBride asserted that the manager of the Westlake depot, Tracy Franklin, warned all drivers not to leave their district during a shift and that Franklin specifically reviewed the company policy in detail with Mason. (Tr. 13.) Although the policy is not in writing, McBride testified that "[i]t is just one of those understood policies that has been around since forever," and that the policy is reviewed with employees at the time of hire.

{¶ 44} McBride asked her assistant manager, Kevin Hanna, to address the policy with everyone in the Westlake depot and make sure they all understood that employees had to stop leaving the area without permission. Franklin also met with everyone to reiterate this policy. On October 17, 2019, Franklin sent an email to Hanna confirming that he reviewed the policy with everyone. The email was forwarded to McBride and Cavanaugh. Franklin's email provided:

> I spoke with Michelle Mason this morning and reiterated the company policy regarding bargaining unit employees leaving the depot delivery area without authorization in a company vehicle. I stressed that lunch breaks were included in the policy. I told her if she had any questions or concerns, now was the time to ask. She replied that she understands the policy and did not have any questions. I followed up by saying disciplinary action could include termination of employment.

This email was admitted at the hearing as company's exhibit A.

{¶ 45} McBride confirmed that the policy prohibiting employees from leaving a delivery area in a company vehicle without permission is "a long-standing policy at the Plain Dealer. It's not a gray area." McBride testified that Franklin specifically reviewed the policy with Mason.

{¶ 46} McBride told Mason during the termination phone call that there was no gray area regarding enforcement of the policy, and that the policy was "too well-documented and too many people know about it."

{¶ 47} McBride explained that when employees were reminded about the company policy in October 2019, Hanna and Franklin did not address the anonymous video and picture they received regarding Mason's company vehicle

parked in the driveway of her home during a shift. Rather, the company focused on reminding employees about the policy.

{¶ 48} Paul Cavanaugh testified, under oath, that the company policy prohibiting employees from leaving their assigned areas during a shift is a "long-standing, well-communicated policy" that dates back to 1995. Approximately eight days before Mason's company vehicle was observed in her driveway during a shift on November 2, 2019, Franklin sat down with the district managers, including Mason, individually, and reiterated the policy that employees cannot leave their assigned area during a shift without permission.

{¶ 49} As the majority recognizes, Mason's recordings of her union grievance meeting and conversations she had before and after the meeting were admitted into evidence at the UCRC hearing. Based on these recordings, Cavanaugh opined that Mason was, in fact, clearly aware of the company policy as of October 17, 2019.

{¶ 50} Mason testified at the UCRC hearing that she had no knowledge of the company policy. She maintained that she first learned about the policy on the telephone call during which her employment was terminated.

{¶ 51} In my view, the testimony of McBride and Cavanaugh, Franklin's October 17, 2019 email, and Mason's recordings constitute competent, credible evidence that Mason either was or should have been aware of the policy. In concluding that Mason was discharged with just cause, it is evident that the hearing officer found the testimony of McBride and Cavanaugh — that the policy is

"understood," "long-standing," "well-communicated," and that Mason was specifically reminded about the policy in October 2019 — to be more credible than Mason's testimony that she had no knowledge about the policy until her employment was terminated on November 11, 2019. The hearing officer was in the best position to make these credibility determinations, and this court must defer to the hearing officer's resolution of the conflicting evidence.

{¶ 52} Finally, as the majority recognizes, the determination of whether just cause existed to terminate an employee is unique to the facts of each case. *Williams*, 129 Ohio St.3d 332, 2011-Ohio-2897, 951 N.E.2d 1031, at ¶ 22; *Tzangas*, 73 Ohio St.3d at 697-698, 653 N.E.2d 1207; *Irvine*, 19 Ohio St.3d at 17, 482 N.E.2d 587. Based on the unique facts of this case and the totality of the circumstances, I would find that there is competent and credible evidence in the record supporting the UCRC's determination that just cause existed to justify discharging Mason.

{¶ 53} For all of the foregoing reasons, I respectfully dissent.